THE ELMIRA IRON & STEEL ROLLING MILL Co., Appellant, *v.* NATHANIEL C. HARRIS, *et al.*, Respondents.

*Court of Appeals, Jan. 22, 1891.*

Rev'g 44 Hun, 626, Mem.

1. *Partnership.    Withdrawal.*—One, who has been a known and recognized partner in a firm, but who has withdrawn therefrom, can only relieve himself from liability for subsequent transactions between his former partners in the firm name and third persons, who were unaware of the change, by giving notice of his withdrawal.
2. *Same.    Publication.*—A notice of dissolution, published in a local newspaper, only affects those who previously had not dealt with the firm, but thereafter deal with the remaining members. As to one, with whom the firm had business relations prior to the publication, actual notice is necessary.
3. *Same.    Dormant partner.*—It *seems* that a dormant partner, in such case, need not give notice.
4. *Same.    "& Company."*—The words "& Company" indicate an agency, and that a principal or principals are undisclosed, and, if credit is given, the law presumes that it was given to all the principals.
5. *Same.*—Facts held sufficient to establish defendant an ostensible, but not a dormant, partner.

Appeal from a judgment of the general term of the supreme court, fourth department, entered on an order affirming a judgment in favor of the defendant Harris, entered upon the verdict of a jury at circuit.

The action is brought to recover upon liabilities of the firm of Blood & Co., originally composed of the defendants.

The defendant Harris alone defends, and upon the ground that several years prior to the transactions upon which this action is founded he had withdrawn from the firm.

It appears that the plaintiff had had dealings with Blood & Co. prior to Harris' withdrawal, and that notice of such withdrawal was not given to the plaintiff. But the defendant insists that he was a dormant partner and therefore not bound to give notice of his retirement from the firm to those with whom the firm had dealt prior thereto in order to relieve himself from liability for an indebtedness subsequently in-

curred by those who continued to carry on the business under the same firm name.

On the first day of January, 1862, John P. Blood, Samuel N. Blood and the defendant, Nathaniel C. Harris, entered into an agreement in writing, the material parts of which are as follows : " The said parties have this day entered into a copartnership, and by these presents do agree to become copartners in the foundry, machine shop business and in all things thereto belonging, and also in buying and selling, building and retailing all sorts of ware goods and commodities belonging to the foundry and machine shop business, and in the manufactory of all implements of husbandry, and in general, all business which has heretofore been carried on by said Blood, and to continue for the term of ten years from the date hereof, if the said parties shall agree in their business. * * * And it is further agreed and understood by and between the parties that the said John P. Blood and Samuel N. Blood are to give their entire personal attention to the management of the business which is to be located and carried on in the boro' of Athens, at such place as shall be agreed upon by the parties, and said John P. Blood and S. N. Blood shall have $600 each year for their services in managing the business as aforesaid, to be drawn from the company's fund, and neither partner shall have the right to draw any further sum without the written consent of the other parties.

" The said J. P. and S. N. Blood agree to give their whole time to the business, and to keep an accurate book or books, with entries of all matters of business belonging to the firm, which shall be accessible to both the parties at all times and for all purposes. * * * And said N. C. Harris shall be consulted in the business and all the plans and operations of the firm shall be made and done with the advice of the firm ; and the said N. C. Harris to have and receive from the firm $100 per year for his services for the care and assistance which he may render to the firm, without giving his personal attention to the business. "

Thereafter and until about October 25, 1869, pursuant to such agreement, the parties thereto conducted business under the firm name of Blood & Co. On the day last named, Harris withdrew from the firm, and a notice of the dissolution was published in one issue of a local paper, but such publication did not come to the knowledge of the plaintiff, and notice thereof was not given nor attempted to be given to the plaintiff otherwise than by such publication. Thereafter the Bloods, together with G. M. Angier, under the same firm name continued the business without interruption until March 21, 1876, when they made a general assignment for the benefit of their creditors. Angier worked in the manufactory as a shop-hand from the formation of the firm in 1862 down to the date of the general assignment, and during all this time there was no change either in the firm name, signs, or general aspect of affairs. Whilst Harris was a member of the firm he was engaged in other business, and took no part in the making of purchases or sales for the firm. He paid some attention to the financial part of the business, and had some correspondence with creditors of the firm, both in the name of the firm and his own. He testified that at the time he entered into the partnership it was said that it should not be made public, " shouldn't be talked about at all," and evidence was introduced in his behalf tending to show that it was not generally understood that he was. John P. Blood testified that it was known by quite a number that Mr. Harris was a member of the firm, and that all persons dealing with the firm who asked him were told that Mr. Harris was a member; that he could not tell how many he told; that they told the parties interested in the concern to know who the partners were, and that it was customary for the firm to tell who were the members of the firm to those dealing with it, if they asked.

Samuel N. Blood testified that the connection of Harris with the firm was not kept secret by him at all, and that he talked of it generally whenever the question came up. It

appears that the plaintiff did not know until after its dealings with the firm of Blood & Co. were at an end that Harris was a member of the firm.    The plaintiff's president testified that no inquiry was made as "to who constituted the firm of Blood & Co.    \*    \*    \*    We thought the credit of Blood & Co. when we first commenced dealing with them was good; we inquired and ascertained that the credit of the firm was good."    The court submitted to the jury the question whether Harris was an ostensible or dormant part- · ner, with instructions that if they should find that under the evidence he was a dormant partner, then the defendant was entitled to a verdict; otherwise, that the plaintiff was entitled to recover.    The result was a verdict in favor of the defendant.

Other facts appear in the opinion.·

*Frederick Collin*, for appellent.

*J. A. Gibson*, for respondents.

PARKER, J.—The question to be determined is presented by an exception taken to the refusal of the court to direct a verdict in favor of the plaintiff.

The plaintiff insisted that it was the duty of the court to determine, as a matter of law, that the defendant while a member of the firm of Blood & Co. was an ostensible partner. The trial court held otherwise, and submitted to the jury the question whether Harris was an ostensible or dormant partner, with the further instruction that if they should find that he was a dormant partner, then the defendant was entitled to a verdict.

Now, it is the general rule that a partner can only relieve himself from liability for subsequent transactions had with his former partners in the partnership name by giving notice of his withdrawal.    Austin *v.* Holland, 69 N. Y. 571; Howell *v.* Adams, 68 Id. 314; Elkinton *v.* Booth, 143 Mass. 479.

The rule is founded upon the principle governing the liability of a principal for the acts of his agent where an agent has once represented his principal; if the principal would avoid responsibility for his acts in the direction of his original authority after the agency has ceased, it is incumbent upon him to notify those with whom he has dealt that such relation no longer continues. And a partner in dealing with third parties in behalf of the partnership not only acts for himself but as agent for each of the other members of the firm. So that when a partner withdraws from a firm it is his duty to give notice of that fact in order that it may be understood that his former partners have no longer any right to represent him. And if he fail to discharge that obligation he cannot thereafter avoid liability for an indebtedness incurred in the partnership name to a party unaware of the changed situation.

It appears that a notice of dissolution was, at the time, published in a local paper, but that could only affect those who should deal with the firm for the first time after the withdrawal. It did not operate as a notice to the plaintiff, with whom the firm had had business relations prior thereto. As to it actual notice could alone suffice. It was not given, and, therefore, defendant is chargeable with the indebtedness sought to be recovered, unless he is entitled to the protection of the one exception to the rule continuing the liability of partners after dissolution who fail to give notice. A dormant partner need not give notice, and the jury have been permitted to find that such was Harris' relation to the firm of Blood & Co. Whether rightly, we must now consider. The first step in that direction is to ascertain what is meant by the term "dormant partner." Bouvier defines "dormant" as sleeping; silent; not knowing; not acting. "A dormant partner" (says Collyer in his work on Partnership, 6 ed., p. 11) "is he whose name and transactions as a partner are professedly concealed from the world, * * * is one who shares in the profits of a business but is not known as a member of the firm."

A dormant partner is one " taking no part in the management of the partnership." Lindley on Part. 16.

" We think, however, the word implies both the quality of secrecy and inactivity." Pars. on Part. 33.

In National Bank *v.* Thomas, 47 N. Y. 15, 19, the court said : " A dormant partner is one who takes no part in the business and whose connection with the business is unknown. Both secrecy and inactivity are implied by the word." As the court cited North *v.* Bloss, 30 N. Y. 374, as well as other authorities in support of the definition given, it is clear that it did not understand or intend that the North case should have the effect of altering a rule which had been long settled as asserted by it. It follows that one occupying such a relation to a partnership need not give notice, because his connection with the firm not having been known it cannot have contributed in any degree towards establishing the credit of the firm, and consequently his withdrawal could not take away a single element which helped to build up the business reputation and credit of the partnership. Such we deem the rule and it should not be extended. Credit is a matter of such importance in the mercantile world, and the financial standing of any partner may through various sources be so readily commingled with that of his firm, that it is essential that he should be required to take the precaution of giving notice of withdrawal unless it clearly appears that his connection with the firm did not add to its reputation for responsibility.

It is not attempted here to establish a partnership liability against Harris on the ground of estoppel, which would have burdened the plaintiff with the necessity of establishing that he held himself, or knowingly permitted another to hold him out as a partner ; that the plaintiff had knowledge of such holding out, and was induced thereby to create the debt, and the authorities applicable to such a situation, of which Thompson *v.* First National Bank of Toledo, 111 U. S. 529 is a type, need not be considered.

The written agreement entered into between the Bloods

and Harris made the parties actual partners. It neither limited the liabilities or the agency of either. It did not suggest that Harris' connection with the firm should be kept secret. It did not provide that Harris should, as to its business, be wholly inactive. It required each of the Bloods to give his entire time and attention to the business, for which each was to be paid $600 per annum. While as to Harris, who was engaged in other business, it was agreed that he should " be consulted in the business and all plans and operation of the firm shall be made and done with the advice of the firm, and the said N. C. Harris is to have and receive from the firm $100 per year for his services for the care and assistance which he may render to the firm, without giving his personal attention to the business."

The agreement, therefore, does not indicate that it was the intention of the parties that Harris should be a secret partner, sharing in the profits as a reward for his contribution to the capital without contributing in any other manner to the standing and business of the firm. Neither was he in fact inactive during the seven years that elapsed before his withdrawal. While he did not engage in the purchase of material or the sale of manufactured articles, he did take part to some extent in the financial management of the partnership, and in the settlement of controversies, in which he wrote letters over his own signature as well as that of the firm. During some portions of the partnership period he was frequently about the shops, at times nearly every day, looking over the work, and occasionally speaking to the different foremen about it.

Neither did his partners keep secret the fact of his connection with the firm.

John C. Blood testified: " I presume it was known by quite a number that Mr. Harris was a member of the firm of Blood & Co.; if a person asked me who had a right to know, I told them; those who had a right to know were the men dealing with us, and the men who were dealing with us who

asked me were told that Mr. Harris was a member of the firm; I couldn't tell you how many I did tell."

Samuel N. Blood testified: " Q.   Was his connection with the firm kept secret by you, or anybody else, to your knowledge?   A.   It was not by me at all.

" Q.   Did you tell persons inquiring that he was a member of the firm?   A.   I did, sir.

" Q.   And talked of it with persons doing business with you generally?   A.   I did, sir, whenever the question came up."

Again, the adoption of the firm name of Blood & Co. is in opposition to the claim of dormancy on the part of Harris.   A dormant partner is one who becomes such by a secret arrangement, while his associates are held out to the world as sole proprietors and managers of the business.   Beecher *v.* Bush, 45 Mich. 188–203.

If the business had been carried on under the firm name of Blood & Blood, or Blood Bros., then the Bloods would have been held out as comprising the entire firm.   But the words " & Co." indicate an agency and that a principal or principals are undisclosed, and if credit is given the law presumes that it was given to all the principals.

In Shamburg *v.* Ruggles, 83 Pa. St. 148, the court says: " If A., B. & C. enter into articles of association and agree that the business shall be conducted by A., and in his name alone, B. & C. in such case are dormant partners, and though liable for the debts and obligations of the firm during its continuance, are not so liable for debts after its dissolution, although notice of such dissolution may not have been given to the public or those previously dealing with it, for it is to be presumed that credit was given upon the responsibility of A. alone, and not upon that of B. & C.   If, however, the business be conducted in the name of A. & Co., a different presumption arises, for then it is supposed that credit is given not to A. alone, but to all those composing the company; in other words, to the firm and not to any one individ-

ual of it.   In such case, if B. & C. retire, notice must be given to those dealing with the firm, or he will continue to be liable for the debts thereof subsequently contracted with former creditors who may be ignorant of the dissolution." To the same effect is the reasoning of the court in De Ford & Co. *v.* Reynolds, 36 Pa. St. 325; Podransnik *v.* Martin, 25 Ill. App. Ct. (111) 300; Deering *v.* Flanders, 49 N. H. 225; Clark *v.* Fletcher, 96 Pa. St. 416.

Notwithstanding the terms of the agreement of partnership, the adoption of a firm name which did not exclude the defendant, the announcement by each of the Bloods to those making inquiries and having dealings with the firm that Harris was one of the partners, and the further fact that he, to some extent, participated in the settlement of accounts and the financial management of the business, facts which, standing alone, determine that Harris' status in the firm was that of an ostensible partner, it is insisted that other evidence presented on the part of the defendant authorized a submission to the jury of the question whether he was a dormant partner.

The evidence relied on in support of such position was, 1, that it was said at the time of the formation of the partnership that it should not be made public, " should not be talked about at all." 2.  The testimony of a number of witnesses residing in that locality, some of whom had had dealings with the firm of Blood & Co., to the effect that they did not know that Harris was a partner.

This evidence, it is asserted, tended to show that his relation to the firm of Blood & Co. was not generally known. It may be observed in passing that one of the Bloods denied that there was any understanding at the time of the formation of the partnership that the fact of Harris' membership should not be talked about, and evidence was adduced on the part of the plaintiff for the purpose of showing that it was quite generally known in the community that Harris was a member of the firm.

For the purpose of this review, however, the plaintiff's answering evidence cannot be considered, as we are to determine whether the defendant's evidence was of such a character as to authorize a jury to find that he was a dormant partner, notwithstanding the facts which if standing alone we have asserted require a holding that he was in law an ostensible partner.

The agreement of partnership was reduced to writing. It does not in any manner suggest that the membership of Harris was to be kept from the public. It purports to embrace the entire agreement and the defendant has not attempted to show that in reducing the agreement of the parties to writing anything was omitted by mistake or otherwise which had been agreed upon. It is not asserted that this so-called understanding was made a part of the original contract. It is not pretended that the parties made a subsequent agreement founded upon a new consideration. It does not clearly appear that the matter was spoken of in the presence of all the parties, much less assented to, for Samuel N. Blood says he does not remember any such thing and was not a party to any such agreement, and Harris' evidence does not necessarily include him. Harris' testimony on that subject and the whole of it is comprised in an answer to a single question. " Q. Now you may tell me at the time you entered into this partnership was there anything said between you as to whether this should be made public? A. There was, sir ; it was not to be talked about at all." It is we think, clear that this evidence cannot be permitted to effect a change in the legal relation which the parties assumed in writing and by subsequent conduct.

Neither can a general partner, who, in order to relieve himself from a liability which attaches to an ostensible partner, assumes the burden of proving that he was a dormant partner, be deemed to have so well borne it as to destroy the legal effect of acts of the character disclosed by this record by the testimony of his neighbors and others, given years

after the dissolution, to the effect that they did not know until after the happening of that event that he was ever a member of the firm, supplemented by the expression of his own opinion that not one in ten in his vicinity knew of it. The question is not whether one knew it, or nearly all, but whether by agreement, the adoption of a firm name, and subsequent conduct, he so held out the Bloods as the only members of the partnership as to prevent his name from contributing to the standing and credit of the firm. If he did not, then he must be visited with the legal consequences of his failure to give notice to those who had, prior to his withdrawal, transacted business with the firm, and the lack of information on the part of some or many persons will not operate to shield him from it.

The plaintiff, it seems, did not know that Harris was a member of the firm, but that fact cannot avail the defendant, because at the time of the commencement of the dealings with the plaintiff he was " an ostensible and not a secret partner, and was such as to all persons dealing with the firm, and his liability to the plaintiff is not changed by the fact that the plaintiff did not know that he was a partner. He trusted the copartnership, whoever the partners might be, who composed it." Howell *v.* Adams, 68 N. Y. 314.

This position is not only supported by authority, but is well founded in the methods largely adopted in business circles for the purpose of ascertaining whether credit shall be given.

The competition in business and rapidity with which orders must be filled, make it necessary for business houses to promptly ascertain whether credit shall be given. This necessity has contributed to the establishment of agencies which undertake to ascertain the financial condition of corporations, firms and individuals engaged in business.

The inquiry addressed naturally is, what is the financial condition of Jones & Co.? For, having no acquaintance with the individuals comprising the firm, information as to

membership does not aid the inquirer. So, in this case, the plaintiff's president testified that no inquiry was made as "to who constituted the firm of Blood & Co. * * * We thought the credit of Blood & Co., when we first commenced dealing with them, was good ; we inquired and ascertained that the credit of the firm was good."

The judgment should be reversed.

HAIGHT, J. (dissenting).—The action was brought to recover upon a liability of the firm of Blood & Co., in which it is sought to charge the defendant Harris as a member of the firm.

The facts are undisputed that from the 1st day of January, 1862, until the 25th day of October, 1869, the defendant was a member of the firm of Blood & Co.; that on the 25th day of October, 1869, the firm was dissolved by the withdrawal of the defendant Harris therefrom, and a new firm organized under the same name, in which one G. M. Angier took Harris' place. The new firm continued business until the 21st day of March, 1876, at which time it made a general assignment for the benefit of creditors. The plaintiff first transacted business with the firm of Blood & Co. in the year 1869, prior to the withdrawal of Harris, and from time to time thereafter it sold the firm material until near the time of the general assignment made as aforesaid ; that the liability upon which this action was brought was incurred shortly before the assignment, nearly seven years after Harris had ceased to have any connection with the firm. It further appears that the plaintiff or its officers did not know that Harris was ever connected with the firm until after the liability upon which this action was brought was contracted and the general assignment was made. It is sought, however, to hold him liable for the reason that no notice was given to the plaintiff or its officers of his retirement from the firm in 1869.

The trial court held that if Harris' connection with the

firm was open and notorious as an ostensible partner, he would be liable, but if his position was not open and notorious as an ostensible partner, but was that of a dormant partner, he would not be liable, and this question was submitted to the jury, who found in favor of Harris, and the judgment entered upon this verdict has been affirmed by the general term.

It has been repeatedly held in this court that questions involving the weight of evidence cannot be here reviewed, that they are finally disposed of by the general term, that this court can only inquire as to whether there is evidence upon which the verdict could stand. The claim is made that there is no such evidence.

A dormant partner has been variously defined as sleeping, silent, not known, not acting, one whose name and transactions as a partner are professedly concealed from the world, one who shares in the profits of a business but is not known as a member of the firm. In its strictest sense it may imply both the quality of secrecy and inactivity, but it has been held that to be such it is not essential that the dormant partner should wholly abstain from any actual participation in the business of the firm or be universally unknown as bearing a connection with it. He may act in an advisory manner in the general business of the firm, and it is sufficient if he is not generally known as a partner. North *v.* Bloss, 30 N. Y. 374.

With this understanding as to the meaning of the term "dormant," we proceed to inquire as to whether there is any evidence tending to show whether Harris was such, which required a submission of that question to the jury. Our attention is first called to the articles of copartnership, in which we find it provided that it is "agreed and understood by and between the parties that the said John P. and Samuel N. Blood are to give their entire personal attention to the management of the business, which is to be located and carried on in the boro' of Athens at such place as shall be

agreed upon by the parties, and said John P. Blood and S. N. Blood shall have $600 each year for their services in managing the business as aforesaid, to be drawn from the company's fund, and neither partner shall have the right to draw any further sum without the written consent of the other parties. The said J. P. and S. N. Blood agree to give their whole time to the business, and to keep an accurate book or books with entries of all matters of business belonging to the firm, which shall be accessible to both parties at all times and for all purposes. * * * And the said N. C. Harris shall be consulted in the business, and all plans and operations of the firm shall be made and done with the advice of the firm, and the said N. C. Harris is to have and receive from the firm one hundred dollars per year for his services for the care and assistance which he may render to the firm, without giving his personal attention to the business."

It thus appears from the express provisions of the instrument that the two Bloods are to carry on the business of the firm, and keep its books ; that the defendant Harris is not to give his personal attention to the business, but is to be consulted. His position in the firm, therefore, is that of a counselor or adviser, and this is one of the things that he may do and not become an active partner.

It is said, however, that the defendant Harris often visited the workshops of the firm, looked over the buildings and the work that was being done by the employés ; that he wrote two letters to individuals in reference to the affairs of the firm, in one of which he signed his own name, and the other that of the company. There is nothing, however, in the contents of the first, subscribed by him individually, which indicates that it pertains to any of the affairs of the firm. The other, however, has attached a bill of the firm for a balance of an account rendered, to which attention is called in the letter, and the statement is made that the same can be settled by the payment of one-half down and by giving a note for the balance. Harris testified that he took no active part in

the business of the firm ; that he was engaged with one Clark in the manufacture of mowing machines, and that they employed the firm of Blood & Co. to manufacture quite a large number of those machines.   If this be so, he could properly look after the construction of the machines from time to time as a member of the firm of Harris & Clark, and still not interfere with his character as an inactive partner of the firm of Blood & Co.   Whilst the writing of the letter on behalf of the firm may be a circumstance for the jury, this act standing alone would not, as a matter of law, constitute him an active partner.

It is urged that the contract does not provide that Harris should, as to the business of the firm, be wholly inactive. Very true no such expression appears in the articles of agreement.   It does, however, state what his duties shall be, that of advising, etc., but as I have already shown, it is not necessary that he should be wholly inactive, or that he should wholly abstain from any actual participation in the business.

It consequently appears to me that taking the evidence in connection with the articles of copartnership a question in which the jury might find that his position in the firm was that of an inactive partner was presented.

It still remains to be determined as to whether his connection with the firm was kept secret to such an extent as not to be generally known.   Upon this question Harris testified that at the time they entered into the copartnership it was talked between them that it should not be made public, that it was not to be talked about at all, that that was the understanding when he went into the firm, that he did not know that anything had been said in reference to his connection with the firm in the community in which they did business.

John P. Blood testified that at the time Harris became a member of the firm it was said that he should not be generally known as a partner.   On his cross-examination he said he presumed it was known by quite a number that Mr. Harris was a member of the firm, that if a person asked him

who had a right to know, he told him, etc.    He does not, however, state that any one did ask him or that he in fact told any one.

Evidence was also given on behalf of the defendant by a number of individuals living at the place in which the firm's business was conducted, to the effect that they had had business transactions with the firm during its existence, and that they never knew or understood that Harris was a member of the firm until the notice of dissolution was published.    It is true that the evidence in reference to the talk about the arrangement to keep Harris' connection with the firm secret is controverted by the testimony of S. N. Blood, and that various witnesses testified that Harris was reputed to be a member of the firm.    But this only raised a conflict in the evidence which it was necessary to have settled by the jury.

If it was talked and understood that his connection with the firm was not to be talked about at all, as testified to by Harris and John C. Blood, and if the testimony of the witnesses who lived in the immediate vicinity is to be believed, to the effect that they had done business with the firm during its existence and had not heard or known of Harris' connection with it, the jury was justified in finding that Harris' connection with the firm was that of a dormant partner.

But it is said that nothing was said about keeping Harris' connection with the firm secret in the articles of copartnership and that this evidence was incompetent and should not have been admitted for the reason that it tends to vary a written instrument, that the contract purports to embrace the entire agreement between the parties.    It is true that nothing is said in the articles of copartnership in reference to keeping secret the relation of Harris, but I do not understand that it purports to embrace the entire agreement.    If it does, may I inquire how much capital was put in by the Bloods or either of them, or by the defendant Harris, and in what proportion were they to share in the profits or be liable in case of losses?

These are quite important subjects in copartnership agreements, and yet in carefully scanning the agreement it appears to be silent upon those subjects.    At the end thereof it states that : " This partnership is made up and based upon all the stocks, tools, patterns, horses, wagons, goods manufactured and in process of being manufactured as per invoice, with the parties' names attached."    But no such invoice is attached to the exhibit and I consequently am unable to determine as to its contents, and yet reference is made to it as an instrument upon which the agreement is based.    So that instead of purporting to embrace the entire agreement it expressly purports to be based upon another instrument which does not appear in the case.

But again, the question of secrecy is not one which would ordinarily be entered in a written contract.    A contract between copartners usually regulates the rights and liabilities of the members of the firm, and it is not usual or customary for it to regulate the rights of strangers or parties with whom the firm may transact business.    Whether or not Harris' connection with the firm was made public or kept secret did not affect or change the rights and liabilities of the copartners. As between the members of the firm their rights and liabilities were the same whether his connection was public and notorious or secret and unknown.    Persons transacting business with the firm alone would be affected.    The evidence was competent and it is in entire harmony with the written contract.

But I am of the opinion that the defendant's motion for a nonsuit might have been properly granted.    My examination of the case fails to disclose any evidence showing that the relation of Harris with the firm was that of an open, notorious, ostensible partner, or that he was generally understood as such.    His name does not appear in that under which the firm did its business.    He was not to be active under the provisions of the agreement, and even conceding the testimony of the witnesses to be true who had heard rumors and

reports in reference to his being a member, it falls short of giving him the general reputation as an acting, ostensible member, which, under the circumstances of this case, would render him liable. If a dormant partner, it is conceded he would not be liable by reason of the failure to give notice of the dissolution of the partnership, and the reason of the rule is that the plaintiff suffers nothing in consequence of such failure. If the plaintiff had no notice of Harris' connection with the firm at the time it transacted its business, it could have given no credit on his account.

This rule is salutary and is founded upon reason. The plaintiff has no right to exact a penalty from Harris by reason of his failure to give notice. The word " dormant," when used in this connection, should be held to cover cases that clearly come within the reason of the rule. The plaintiff, in order to recover, must show that it has suffered in consequence of his neglect. It is frankly admitted that the president or officers of the plaintiff did not know that Harris was a member of the firm at any time until after the final credit was given and the general assignment of Blood & Co. was made.

It therefore gave no credit to the firm on account of Harris and it suffered nothing by his failure to give a notice of his retirement, unless his relation with the firm was so notorious and ostensible as to give it a financial standing and reputation with the public. There is no pretense that his relation was of this character, or that any credit was given by the plaintiff because of any such reputation. It would rather appear that the credit was given on account of the Bloods, for in the examination made by the plaintiff before giving credit it is stated that they discovered that the real estate upon which the buildings were constructed belonged to the Bloods.

In the case of Davis *v.* Allen, 3 N. Y. 168–172, the action was brought against three persons as partners, who did business under the name of the Albany & Buffalo Towing Company. The action was for work and labor done and per-

formed. The defense of the defendant Childs was that the demand accrued against the company subsequent to his ceasing to be a member of the firm. His name did not appear in the name under which the company did its business. It was claimed, however, that he was liable for the reason that the plaintiff had worked for the company during the years that he was a member, and that no notice had ever been given of his retirement from the firm. JEWETT, Ch. J., in delivering the opinion of the count, states the general rule, and then concludes as follows : " In order to render him liable on this ground it is necessary that he should have been known as a member of the firm to the plaintiff, either by direct transactions or public notoriety."

In the case of Thompson *v.* First National Bank of Toledo, 111 U. S. 529, the court at circuit was requested to instruct the jury that if Thompson was not in fact a member of the partnership the plaintiff could not recover against him, unless it appeared from the testimony that he had knowingly permitted himself to be held out as a partner, and that the plaintiff had knowledge thereof during its transactions with the partnership. The court charged all except the last proposition, which it refused. On review it was held that the circuit court erred, holding that the plaintiff could not recover unless he had knowledge that the defendant held himself out as a member of the firm during the time that the plaintiff had transactions with the partnership.

Whilst this case differs from the one under consideration, the principle involved is the same. GRAY, J., in delivering the opinion of the court, says : " A person who is not in fact a partner, who has no interest in the business of the partnership and does not share in its profits, and is sought to be charged for its debts because of having held himself out or permitted himself to be held out as a partner, cannot be made liable upon contracts of the partnership, except with those who have contracted with the partnership upon the faith of such holding out. In such a case, the only ground

24

of charging him as a partner is, that by his conduct in holding himself out as a partner he has induced persons dealing with the partnership to believe him to be a partner and by reason of such belief to give credit to the partnership.   As his liability rests solely upon the ground that he cannot be permitted to deny a participation which, though not existing in fact, he has asserted or permitted to appear to exist, there is no reason why a creditor of the partnership, who has neither known of nor acted upon the assertion or permission, should hold as a partner one who never was in fact and whom he never understood or supposed to be a partner at the time of dealing with and giving credit to the partnership." In further discussing the question the learned justice in his opinion calls attention to the exception and says that " there may be cases in which the holding out has been so public and so long continued that the jury may infer that one dealing with the partnership knew it and relied upon it, without direct testimony to that effect," in which case the party would be liable.

Collyer in his work on Partnership, in § 536, says :  " Even where a person has retired from a firm, who, though intentionally a dormant partner, was known to many as a member of the firm, he will not by failing to give notice of his retirement become liable to the creditors of the remaining partners if such creditors at the time of their respective contracts were ignorant of his being a partner." See, also, Story on Partnership, §§ 159-160 ; 1 Lindley's Law of Partnership, 410 ; North *v*. Bloss, *supra.*

I do not understand the case of Howell *v*. Thomas, 68 N. Y. 314, to be in conflict.   In that case the defendant had been a member of the banking firm and had filed a certificate with the superintendent of the banking department under the provision of the act to authorize the business of banking and the acts amendatory thereto.   He was by this certificate made a notorious, active, ostensible partner upon which as a banking firm a financial credit was given.   The business was conducted under the name of the Suffolk County Bank.

The plaintiff did not know who composed the firm at the time of making his deposit.　It was, however, held that the defendant was. liable even though notice of his prior withdrawal had been given.　Attention is called to this distinction in the opinion of GRAY, J., in the case of Thompson *v.* First National Bank of Toledo, *supra,* and also by JEWETT, Ch.·J., in the case of Davis *v.* Allen, *supra.*

I cannot believe that there is anything in the name of "Blood & Co." that makes the defendant Harris liable. There were two members by the name of Blood and one could properly be known as the company.

I am therefore of the opinion that the judgment should be affirmed, with costs.

Judgment reversed and new trial granted, costs to abide the event.

All concur, except HAIGHT, J., dissenting, and FOLLETT, Ch. J., not sitting.