THE BANK OF THE MONONGAHELA VALLEY, Appellant, *v.* ABIJAH WESTON and ORREN WESTON, Respondents, Impleaded with WILLIAM W. WESTON and EDWIN F. CURTIS.

1. APPEAL — VERDICT BY DIRECTION — FACTS. Where a verdict was directed by the court, although the unsuccessful party asked to go to the jury, all the facts warranted by the evidence must be assumed, for the purpose of an appeal by the unsuccessful party, as settled in his favor.

2. PROMISSORY NOTE NOT RECEIVED FROM PARTY PRIOR TO INDORSER. When a promissory note was not received by the holder from any party prior in order of liability or possession to the indorser, it is not within the rule that when a note is presented by the maker the purchaser has, from that fact, notice that the indorsements were not made in the ordinary course of business.

3. ACCOMMODATION INDORSEMENTS BY PARTNER IN FIRM NAME — QUESTION OF RATIFICATION BY COPARTNERS. Failure of the other members of a partnership to stop their co-member from indorsing the firm name for the accommodation of third parties, or to give notice of his want of authority so to do, after repeated offenses constituting a systematic and persistent course of conduct, known to the other members and privately objected to by them, constitutes evidence of acquiescence and ratification which raises a question of fact as to their good faith and as to an implied authority to make the indorsements, even in the case of a holder who had received from the maker notes so indorsed.

4. CONTINUANCE OF PARTNERSHIP, AS TO THIRD PERSONS, AFTER DISSOLUTION. A partnership and the authority of one member to bind the others by his acts continue, notwithstanding a formal dissolution, as to third persons acting in good faith and having no notice of dissolution.

5. INSUFFICIENT NOTICE OF DISSOLUTION. Mere notice to two prominent commercial agencies, of the dissolution of a partnership, is insufficient to affect a non-subscriber to either agency with general notice of the dissolution.

*Bank of Monongahela Valley* v. *Weston*, 12 App. Div. 624, reversed.

(Argued April 26, 1899 ; decided June 6, 1899.)

26

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered December 29, 1896, overruling the exceptions of the plaintiff and dismissing the complaint, with costs.

The nature of the action and the facts, so far as material, are stated in the opinion.

*C. S. Cary* for appellant.    While it is the law that when a promissory note is presented by the maker, it is to be construed as notice to the purchaser that the indorsements are accommodation, this rule cannot be applied to the $2,500, forming a part of the $5,000 note, because to the extent of $2,500 thereof no such notice can be held to exist. (*A. E. Nat. Bank* v. *N. Y. B. & P. Co.*, 148 N. Y. 698 ; *J. I. Co.* v. *Walker*, 76 N. Y. 521 ; *Leary* v. *Miller*, 61 N. Y. 488 ; *Cady* v. *Bradshaw*, 116 N. Y. 188 ; *N. H. R. Bank* v. *Reynolds*, 57 Hun, 307.) It is shown that an agreement was made between the members of the firm of Weston Brothers on the 4th day of January, 1892, that they should dissolve the firm, and in fact the property of the firm was transferred to the A. Weston Lumber Company, but no sufficient notice of such dissolution was given. So that it cannot be held that as to the plaintiff there was any dissolution of this firm. (*City Bank* v. *McChesney*, 20 N. Y. 240 ; *Elmira Iron Co.* v. *Harris*, 124 N. Y. 280 ; *Austin* v. *Holland*, 69 N. Y. 571 ; Story on Part. § 161 ; *Vernon* v. *Manhattan Co.*, 17 Wend. 525 ; *Nat. Bank* v. *Norton*, 1 Hill, 572 ; *Holdane* v. *Butterworth*, 5 Bosw. 1 ; *B. C. Bank* v. *Howard*, 35 N. Y. 500 ; *Clapp* v. *Rogers*, 12 N. Y. 286.) When the defendants show that the notes in suit were indorsed for the accommodation of the makers and outside the business of the firm, they throw upon the plaintiff the burden of showing, except as to the $2,500 note above referred to, that the indorsement was made by authority of the members of the firm. (*Messenger* v. *F. Nat. Bank*, 6 Daly, 120 ; *S. H. B Co.* v. *E. H. B. M. Co.*, 90 N. Y. 613 ; *Bank of Batavia* v. *N. Y., L. E. & W. R. R. Co.*, 106 N. Y. 199 ; *Trustees, etc.*, v. *Smith*, 118 N.

Y. 634; *Griswold* v. *Haven*, 25 N. Y. 600; *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 30.) All partners must be held to have notice of the acts of any partner in connection with their business, as in the discharge of their duty they ought to have obtained. (Story on Part. § 168; *N. R. Bank* v. *Aymar*, 3 Hill, 362; 106 N. Y. 199; 25 N. Y. 600; 34 N. Y. 30.)

*J. H. Waring* for respondents. The indorsement of the notes in suit was never binding on the respondents' testator. (1 Bishop on Crim. Law, § 592; 2 Bishop on Crim. Law, § 523; *People* v. *Fitch*, 1 Wend. 198; *People* v. *Cady*, 6 Hill, 490.) The burden was on the plaintiff to show that it was a *bona fide* holder, even if the note had not been a forgery, and that it failed to do. (*Foot* v. *Sabin*, 19 Johns. 154; *Laverty* v. *Burr*, 1 Wend. 529; *Sweetzer* v. *French*, 56 Mass. 309.) The indorsement of the notes by William W. was an attempt on his part to pledge the credit and responsibility of his two brothers without their consent, and constituted a fraud. (*Foot* v. *Sabin*, 19 Johns. 154; *Gansevoort* v. *Williams*, 14 Wend. 133; *Joy* v. *Diefendorf*, 130 N. Y. 6; *Vosburgh* v. *Diefendorf*, 119 N. Y. 357; *C. N. Bank* v. *Diefendorf*, 123 N. Y. 191; *F. N. Bank* v. *Green*, 43 N. Y. 298; *O. N. Bank* v. *Carll*, 55 N. Y. 440; *Nickerson* v. *Ruger*, 76 N. Y. 279.) The undisputed evidence shows the plaintiff took the notes, charged with full notice of the accommodation character of their indorsements. (*Foot* v. *Sabin*, 19 Johns. 154; *Gansevoort* v. *Williams*, 14 Wend. 133; *Joyce* v. *Williams*, 14 Wend. 141; *Stall* v. *Catskill Bank*, 18 Wend. 466; *Elliott* v. *Dudley*, 19 Barb. 326; *Bank of Rochester* v. *Bowen*, 7 Wend. 159; *Fielden* v. *Lahens*, 6 Abb. [N. S.] 341; *U. N. Bank* v. *Underhill*, 21 Hun, 178; *A. S. Bank* v. *Savery*, 82 N. Y. 291; *N. P. Bank* v. *G. A. M. W. & S. Co.*, 116 N. Y. 281.) The plaintiff did not discount either of the notes in the usual course of business, which alone deprives it of the character of a *bona fide* holder. (*C. N. Bank* v. *Diefendorf*, 123 N. Y. 121; *Hall*

v. *Wilson,* 16 Barb. 548; *Keutgen* v. *Parks,* 2 Sandf. 60; *Ramsdell* v. *Morgan,* 16 Wend. 574.) Defendants were not estopped from denying their brother's authority. (*Brown* v. *Bowen,* 30 N. Y. 519.) It is of no consequence whether the plaintiff had notice of the dissolution of the firm or not. (*City Bank* v. *McChesney,* 20 N. Y. 240; *Leonard* v. *Whitman,* 20 Mass. 176; Story on Part. § 334; *Ketcham* v. *Clark,* 6 Johns. 144; *N. S. & L. Bank* v. *Herz,* 89 N. Y. 629; *Holt* v. *Allenbrand,* 52 Hun, 217; *Coddington* v. *Hunt,* 6 Hill, 595.)

VANN, J.   This action was brought upon two promissory notes, each made by Edwin F. Curtis, payable to the order of Weston Brothers, at the Bank of the Monongahela Valley, Morgantown, West Virginia, indorsed by Weston Brothers as first indorsers, and by William W. Weston as second indorser. The first note, dated at Olean, N. Y., December 15, 1892, was for $6,500, and ran four months, while the second, dated at the same place March 31, 1893, was for $5,000 at thirty days. The defense pleaded by Abijah and Orren Weston, who alone defended, was that the indorsement of the name of their firm was made after the dissolution thereof, by William W. Weston, the third member of the firm as it was formerly constituted, fraudulently, for the accommodation of the maker and without the knowledge of the other members, and that the plaintiff took the notes with knowledge of these facts.

The note for $6,500 was discounted by the plaintiff on the 22nd of December, 1892, and the proceeds were used to pay a note dated April 7th, 1892, made by Curtis and indorsed by Weston Brothers for $1,760.28; also a note for $2,000, made and indorsed the same way, which became due on the 11th of February, 1892, and the balance was paid in cash. The other note in suit was given in renewal of two notes, dated June 4, and November 19, 1891, for $2,500 each, both made and indorsed in the same way and carried along until they formed a part of the consideration of said note for $5,000. The note of June 4, 1891, for $2,500 was the first of the

series discounted by the plaintiff.   It was sent to the plaintiff by the cashier of a bank in Olean, and before the same was discounted the cashier of the plaintiff wrote to him stating that the parties were strangers and asking if he regarded " the note as all O. K."   The answer of the cashier at Olean was as follows: " We consider Weston Brothers good beyond question.   They are probably worth from one to two millions of dollars."   Thereupon the note was discounted by the plaintiff and the proceeds remitted to the bank at Olean.

None of these notes, in fact, passed through the hands of Weston Brothers in the course of their business, nor did the firm have any benefit from the discount thereof.   They were indorsed in the name of the firm by William W. Weston, one of the members, for the accommodation of the maker.

The firm of Weston Brothers, composed of Abijah, Orren and William W. Weston, was organized about 1853, and did a large and prosperous lumbering business at Weston's Mills, three miles from Olean, until it was dissolved in January, 1892.   It was managed by William W. Weston, the resident partner, the residence of Abijah Weston being at Painted Post, about one hundred miles distant, and of Orren Weston at Tonawanda, over eighty miles distant.   William signed checks, indorsed notes, and used the firm name in the transaction of the business of the firm, and as early as 1882 he began to use the firm name in indorsing for his friends.   He did not simply indorse at rare intervals, but made it a practice, and continued it for ten years, until the dissolution of the firm, and even for a year or two after that.   The other members knew that William was occasionally using the firm name in this way, although they did not know to what extent.   They learned of it in various ways, sometimes by public report, and at others through the inquiry of some bank or individual to whom an accommodation note thus indorsed had been offered for sale.   Their suspicions were aroused from seeing " these men around the office," for whom William was indorsing. They were accustomed to remonstrate with William and tell him he must not do it any more, and in response to letters of

inquiry from four different banks, Abijah wrote stating that William had no right to use the firm name in that way, and that "they must not use the paper thinking they could hold me." He also wrote to individuals to the same effect, but still William kept on indorsing, and the other members, Abijah being the most prominent and anxious upon the subject, kept hearing of it. He used to go to Weston's Mills several times a year, mainly for the purpose of expostulating with William about this practice. He testified that he "advised him" (William) "to take security for these indorsements, but I do not know whether he did or not." The bookkeeper, William's son, swore he told Abijah that he feared the amount was larger than his father would admit, and that every time Abijah came there "the talk was on this subject, in 1888, 1889, 1890 and 1891. Abijah would say, 'You must not do it; you will injure my credit.'"

Abijah, who stayed at William's house whenever he came to Weston's Mills, asked him how much paper was out and who the makers were, etc., but William was reticent upon the subject and volunteered no information. At one time the partners learned that one bank in Olean held paper of this kind to the amount of $70,000, but upon confronting William with the fact he insisted that there was not more than $35,000. They made no inquiry at the bank or of persons outside of their own office. Abijah threatened periodically to dissolve the firm, or to post William as acting without authority in making these indorsements, unless he would stop, and he always promised to stop, but never kept his promise. About the first of April, 1891, he was asked by Abijah how long it would take to get rid of the paper that was then out, about $40,000 in amount, and he said "six months," whereupon Abijah told him that he would give him that period to get rid of it, but in the meantime he must not indorse any more. Orren, in testifying to this conversation, did not state that Abijah told William he must not indorse any more. William, however, kept on indorsing and Abijah kept learning of it and remonstrating, but no notice was given to the public and

no effective step was taken to restrain William from making these accommodation indorsements right along to the amount of many thousands of dollars. Nothing was done by the other members of the firm except to expostulate with William and accept his promises not to do so any more, even after they knew he had systematically violated previous promises to the same effect. On the 27th of February, 1890, Abijah wrote to William, and after stating that he inclosed a letter that he had received, said : " I am perfectly astonished to receive such letters. I cannot understand what it means. I had rather a man would steal my money than my credit. I feel proud of my credit, but it appears you do not care. It is so strange you should persist in doing so after I have forbid you doing it, after all I have done for you and am still willing to do, but I tell you for the last time I won't stand it. I can stop it and must if you persist in it. How would it look to be posted forbidding you signing paper, and how I would hate to do it, but I must protect myself." This had no effect, and nearly a year later, on the 26th of January, 1891, he wrote him again, saying : " You do not say you will stop using my name. If you will promise never to put my name on paper outside of our business again I will take your word once more. If you will not promise then I must take means to stop it. Now, Wallace, think how it will look for me to have to take any legal means. I can't hardly think of it, but to save myself it must be done, and at the same time save you and save your son from worrying about it." No inquiry was made at any bank, not even at the one in Olean, where the firm did its banking business, to learn how much of this paper was held by them, and no notice was given of any kind. Finally the brothers began to be sued on this paper, and on the 4th of January, 1892, the firm was dissolved " in order to prevent this thing going on any further," and a corporation was organized to carry on the same business, but no public notice of the dissolution was given through the press or otherwise. It was the custom of the bookkeeper to inclose with his business correspondence for the firm, and the corporation

that succeeded it, a printed slip stating that the firm had been dissolved, but these notices were not sent out generally or otherwise than as stated. No notice was sent to the plaintiff. It also appeared that they sent reports to two commercial agencies, but the plaintiff was not a subscriber to either and had no knowledge of the dissolution in any way when it discounted the notes in suit. Notwithstanding the dissolution, William continued to indorse after that event the same as before.

Other facts similar in character to those stated were proved. A large amount of this accommodation paper was put in evidence, as well as ten judgment rolls, representing judgments recovered by default against the firm after a personal service on each member thereof, upon paper indorsed in this way. When both parties rested, the court, on motion of the defendants, directed a verdict in their favor, although the plaintiff asked to go to the jury upon the whole case. An order having been made that the plaintiff's exceptions should be heard in the first instance by the Appellate Division, that court overruled the exceptions and dismissed the complaint.

As a verdict was directed for the defendants, although the plaintiff asked to go to the jury, all the facts warranted by the evidence must be assumed as settled in favor of the plaintiff for the purpose of this appeal. (*First National Bank* v. *Dana*, 79 N. Y. 108; *Stone* v. *Flower*, 47 N. Y. 566.)

When a promissory note is presented by the maker, the purchaser has notice that the indorsements were not made in the ordinary course of business, because in that event the maker would not have it in his possession. The note of June 4th, 1891, for $2,500, was not presented by the maker and hence it was taken without notice to put the plaintiff on inquiry as to the regularity or binding force of the indorsement. It was received from a bank and not from any party prior in order of liability or possession to the indorser, and was not accepted until after due inquiry whether it was all right, which elicited only favorable information. The plaintiff could have recovered upon that note and hence it constituted a good consideration, *pro tanto*, for the note for $5,000,

of which it became a part. The claim of the defendants, that it was not protested, is not borne out by the record, which expressly shows presentment and protest in the usual way. Moreover, the successive renewals extended the time of payment, as there was no change in the parties to the note, and hence no presumption of the payment of any of the series. (*Jagger Iron Co.* v. *Walker*, 76 N. Y. 521.)

The plaintiff was put upon inquiry as to the other notes, as they were presented by the maker. The remainder of its claim, therefore, depends upon the implied authority of William to make accommodation indorsements in the name of his firm. According to the evidence we think this was a question of fact, as we have already held in *Smith* v. *Weston*, a companion to the case in hand, and argued in connection therewith. The testimony, which came mainly from Abijah and Orren Weston, who were interested witnesses, presented a singular state of facts, as the jury might have found. For about ten years two members of the firm of Weston Brothers knew that the third was constantly using the firm name for the accommodation of friends. Having the power to prevent it they took no effective steps to do so, but let the public run the risk of loss through his indorsing in the name of the firm. They repeatedly remonstrated with him in private, and he always promised to stop, but never kept his promise, and they had reason to believe not only that he did not intend to keep it, but that he knew they did not expect him to keep it. If, upon the first discovery, they had warned him and he had not only promised, but had also lived up to his promise, no question of fact would have arisen. Perhaps there might be more latitude than this without presenting a question of fact, but a systematic and persistent course of conduct, known to the defendants, calls in question their good faith. They had no right to assume that William would do otherwise in the future than he had in the past. If a son should forge his father's name, to his knowledge, for a series of years, mere private expostulation would not save the father from liability. It would be necessary for him to take some public action for

the protection of innocent persons. (*Weed* v. *Carpenter*, 4
Wend. 219, and 10 Wend. 404.) . If Abijah and Orren Wes-
ton, knowing that the public was liable to be injured, pre-
ferred that William should keep on indorsing rather than dis-
grace him by exposure, they must take the consequences, for
the sanctity of commercial paper and respect for the rights of
third persons will not permit the business community to be
imposed upon by their negligence if a jury finds, under all
the circumstances, that the negligence was so persistent as to
amount to ratification. Failing to stop him, or to give notice
of any kind, after repeated offenses, is evidence of acquies-
cence in and ratification of his course. They cannot rest on
their objections and his promises, under the facts disclosed,
without subjecting their good faith to the scrutiny of a jury.
Resistance may be so feeble as to be evidence of acquiescence,
and persistent acquiescence is evidence of implied consent.
They knew that it did no good to talk to him upon the sub-
ject, and that outside parties were liable to be victimized by
their failure to act. If they had not given him six months'
time in the spring of 1891, the plaintiff could not have acquired
the paper in suit. If they meant what they said, why did
they not act accordingly? Did not mere remonstrance finally
become submission? Did they not encourage him to con-
tinue? Did not both his course and theirs lead him to under-
stand that if he continued to do in the future what he had
repeatedly done in the past, to their knowledge, it would meet
with the same treatment only in the future that it had in the
past? When they threatened dissolution or exposure if he
indorsed without authority again, why did they not keep their
word if they were sincere? Why did they have the same
stereotyped conversation every few months, for year after
year, accept the same promise and condone its violation, with
unvarying regularity, if they were acting in good faith? Did
they prefer that innocent persons should suffer loss rather
than hurt their brother's feelings? Did they keep silent when
it was their duty to speak? Were they making evidence to
protect themselves if William finally went too far and they

concluded to repudiate? Was their story, as a whole, probable, and was the jury bound to believe it? These inquiries, which bear upon the main question of good faith, acquiescence and ratification, were for the consideration of the jury, and we think the trial court erred in not submitting the case to them for consideration. Juries have a right to look between the lines of the evidence and infer what a man's intention was from his conduct, beyond the positive testimony in a case.

It is, however, insisted that as the indorsements in question were made after the dissolution, they were the acts of William only, and did not bind the firm because he had ceased to be its agent. A partnership continues, notwithstanding formal dissolution, as to third persons acting in good faith, who have had neither actual nor constructive notice that the firm has been dissolved. The rule is that as to all persons who have had actual dealings with the firm, actual notice of the dissolution must be given (*Vernon* v. *Manhattan Co.*, 17 Wend. 524; affirmed, 22 Wend. 183; *National Bank* v. *Norton*, 1 Hill, 572; *Buffalo City Bank* v. *Howard*, 35 N. Y. 500); as to all who have had no dealings with the firm, but knew of its existence, though not of its dissolution, it is necessary that notice should be published by advertisement in a newspaper. (*City Bank of Brooklyn* v. *McChesney*, 20 N. Y. 240; *Austin* v. *Holland*, 69 N. Y. 571; *National Shoe & Leather Bank* v. *Herz*, 89 N. Y. 629; *Elmira Iron & Steel Rolling Mill Co.* v. *Harris*, 124 N. Y. 280.) It may be that general notice of dissolution, as distinguished from particular notice, can be given in other ways, but we are of the opinion that mere notice to two prominent commercial agencies, the plaintiff not being a subscriber of either, is insufficient, because such agencies circulate the information contained in their books and reports among their customers only, who are required to treat it as confidential in character.

Without prolonging the discussion, we think that the judgment appealed from should be reversed and a new trial granted, with costs to abide the event.

All concur.

Judgment reversed, etc.